Good morning, Your Honor. Leighton Anderson on behalf of appellants. I'm mindful of the court's comment earlier about time, and I will be brief. I would like to reserve a couple of minutes for rebuttal. Your Honors, it's fair and accurate to observe that the Congress in enacting the Petroleum Marketing Practices Act intended to preserve a measure of flexibility for franchisors in implementing marketing decisions at the same time as Congress was clearly and expressly regulating the power of franchisors to terminate a franchise or non-renew a franchise relationship. The record in this case shows time after time the franchisor in this case failing to comply with the expressed statutory requirements of the Petroleum Marketing Practices Act. And yet the district court excused those failures sequentially, either excused them or overlooked them, citing the general policy of flexibility. Your Honors, that allows the concept of flexibility to eat up the statute to the detriment of the class of persons intended to be protected by the statute. The one of those errors simply goes to the fundamental basis of the original ground for non-renewal used by TASFA in this case, which was that it was their burden of proof to show that they had lost the right to grant possession of the leased marketing premises through expiration of the underlying lease. They were unable to show that because, in fact, they had not lost the right. The district judge said, well, they intend to surrender the lease. TASFA says, we sincerely desire to surrender the lease. In the excerpts of record, though, at page 1027. I'm sorry, I just wanted to find that. Excerpts of record at page 1027, TASFA said, this is in the 2002 franchise agreement. I apologize. In the 2002 franchise agreement, this is the tricky franchise that they offered after the preliminary injunction had been issued. Their addendum, and I am on page 1027, says that TASFA and its lessor under the underlying lease, Thrifty Oil Co., are currently involved in a dispute regarding whether TASFA's tenancy should be extended from month to month due to the reported presence of environmental contamination on and affecting the service station property. The resolution of that dispute, with or without court intervention, will likely affect the existence and duration of the underlying lease. Now, that's an admission that the underlying lease is at least arguably still in effect. The lessor testified is still in effect. The plain language of the lease indicates that it's still in effect. Why? Because there's contamination on the premises, admitted contamination, hasn't been cleaned up, and the lease says that the lease will be extended while that is going on. It was Conoco's burden of proof to show that they had lost the right to grant possession of the premises, and they failed to meet that burden of proof. And they can't just meet that burden of proof with a self-serving declaration. Well, that's what we want to do when we can. Even if the court overlooked that, there were problems with both the original disclosure required by the statute and also with the notice of non-renewal that Tosco gave. The original disclosure required by the statute specified a date for the expiration of the lease, which was not, in fact, the date on which Tosco ultimately claimed the lease had expired. And the notice of non-renewal, the only notice that specified a non-renewal date that Tosco was prepared to enforce, was given only 35 days prior to that effective date, not the 90 days normally required by the statute. Of course, the statute says if it would not be reasonable. Franchisee order can show that it would not be reasonable to give 90 days. You can give a lesser period, but that requires the franchise order to come forward with evidence at trial, that it would not be reasonable to give 90 days. The truth is, Tosco had complete control. The landlord was taking the position that they were required to stay there, certainly was willing to let them stay there as long as they wanted to. And so Tosco had complete discretion  that they would require the appellants to vacate or go to court to seek their PMPA remedy or what have you. Well, as I understand it, the holdover tenancy was for purposes of environmental cleanup. How could the lease be consistent with that? How could you be running a gas station at the same time as you clean it? They're doing it right now. It's perfectly possible, and in fact done, to conduct vapor extraction operations with a unit planted on the premises and still conduct business operations at the location. As a matter of fact, that was the evidence. There was environmental reports submitted into the record showing what Tosco was doing with regard to environmental cleanup while appellants were continuing to operate the service station there. The two can exist side by side and, in fact, have been doing so. And that's what you're arguing for, is that that continued to the end of the cleanup? If it continues, as long as they have that lease with Thrifty, which under the terms of the lease apparently continues to the end of the cleanup, yes, Your Honor. And again, if this isn't clear, bear in mind it's their burden of proof to show that they have lost the right to grant possession of the premises due to the expiration of an underlying lease. And then, as I say, after the action is commenced, and these circumstances really are unique. I don't know that anyone's tried this, but they shouldn't have. They have a preliminary injunction and they don't like it. So they think, well, what should we do? And they say, here you go. What we're going to do is we're going to make you take this new lease. And it's going to have some provisions that make it evaporate any time we want to. And we're going to bump the rent by $9,000. But if you don't take it, we're going to have a new ground on which to terminate or on which to not renew you because now you've failed to accept an offer of a new franchise proposing good faith and normal course of business. And that's a different ground for non-renewal. By doing that, by presenting a new offer and saying, this is a new offer. If you take it, it's going to moot your PNPA action. What they've done is they've waived, they've acted inconsistently with their prior contention that the franchise was terminated. They've also done it in a way that it was clearly intended to cause termination or non-renewal because they selected a rent term in a manner completely outside of the normal course of business and, in fact, fudged a little bit even by the attorney involved in directing the progress of the case. And so once they did that, Your Honors, I believe that the district court should have taken our suggestion to focus on that issue in the case to the exclusion of whatever had gone on before because basically they changed the game by saying, all right, we're willing to go forward. Here's a new lease. Accept these terms. I think that became a 2802B3A case concerning a franchise offer rather than the ground that they were previously relying on. I'd also like to point out, because I'm not sure whether this is clear, I'd also like to point out that there are other grounds for non-renewal on which Tosco might have relied. They talk about the station being uneconomic for them to operate. There is a ground for non-renewal concerning when a franchisor makes a good faith determination that the continuation of the franchise will be uneconomical. The problem is that the conditions imposed on the use of that ground for non-renewal are not as favorable to Tosco as the one that they selected, because although they're still required to offer a right of first refusal, offer to transfer to the franchisee of the same interest, the expiration of lease provision also says, but you can insist on getting a release from the property owner with regard to environmental contamination, which is what they really, really wanted in this case. Your Honors, I want to make sure I speak about the bond issue also, but before I leave the P&PA issues, I'll be happy to respond to any questions that the Court might have. Just briefly on the bond issue, Judge Taylor initially, at the time he granted a preliminary injunction, set a $25,000 bond, didn't have any problem with that. After this new franchise agreement came along with the increased, vastly increased rent requirement that they then wanted to impose, they went to what was, to the court then Judge Walters, and said dissolve the injunction because they didn't take the deal. Or at the very least increase the bond because look at all the rent we're losing. We just added $9,000 and they're not paying it. So obviously that's our damages under the preliminary injunction. What's wrong with that is number one, you just can't make up a number and then say that's your damages. It doesn't take into account the fact that they're selling gasoline at the station and continuing to engage in those operations. Never came forward with any evidence regarding the profitability of those operations to the overall company as opposed to the little marketing division. But also the preliminary injunction concerns what are their damages from the continuation of the franchise relationship at the time that injunction was given. The fact is that Tosco had always subsidized the rent at that location. Tosco had always been willing to accept less rent from the dealer than it was paying to the landlord for the right to have a business there to which they could sell gasoline. And so that doesn't become their damages without taking into account the gasoline sales. Plus the fact, as I said, the evidence at trial was pretty clear that the new rent number was made up out of whole cloth. And Judge Walters even saw that and remarked about that at closing argument. So then to go from there to say from a $25,000 bond to $120,000, require these folks to put up $120,000 in cash for the right to remain in business was unwarranted by anything in the record and really put a severe limitation on their ability to vindicate their rights, even though that's what they've tried to do. Unless the Court has any other questions, I'll just reserve two minutes for rebuttal. Thank you. All right. Thank you. May it please the Court. Steven Irv for Defendant Annapelle Tosco Corporation. Very briefly, Your Honor, this case is typical of the cases where the PMCA is being interpreted to elevate procedural exactness over the substantive protections. I feel that this case is governed by the Hy-Fay decision by this Court. There's no other court that's gone as far as the plaintiff asked in this case in terms of requiring the extension of an underlying lease after its disclosed base term has expired, that the only purpose for holding over on the part of the franchisor is literally to shut down the operations. We're trying to remove the tank system, test the tank system, clean up the soil. Contamination may be beneath the pumps. It may be beneath the tanks. What's happening is the franchisee is advocating this holdover right or the continuation of a franchise, which is absolutely hamstringing the franchisor who's come to the end of his term. And you can approach it two different ways. You can say, look, the disclosed base term of the underlying lease expired, end of the ballgame, franchisor disclosed it, gave notice, made every effort in the book to assign the rights to continue at that location to the franchisee and is now entitled to move on. You can also look at it as one of these other similar events where, again, the purpose of the holding over that we're talking about, this is not a new base term. This is not a new three-year term by Costco with the intention of marketing motor fuel, either through their own employees or through anyone else. The only reason that they might be required to hold over is to expedite their cleanup. And, yes, it's possible to conduct the cleanup, as you asked, Your Honor. It's possible to conduct that cleanup in conjunction with operating a service station. But it's not necessarily the ideal way to do it. Typically, as an exiting tenant, you're going to tender possession, you're going to clean everything up. We need to certify the condition of the tanks. We need to create baseline data on how extensive the contamination is. So if you continue operating, you're just renewing ongoing risk of new releases from any part of the system. It could go on and on. You actually inadvertently create an incentive for the subtenant franchisee to allow more environmental releases because he gets to stay in possession longer. So the purpose of the extension, to the extent there's any technical extension of possession, was unrelated to the marketing of motor fuel. And that's the spirit of every decision that's touched this, whether it's the Hutchins case out of the Eleventh Circuit, the Hy-Fay decision out of this circuit. Why is the franchisor even sticking around? Now, actually, the converse of that, going back to your question, Your Honor, if we're going to get into a dispute that really isn't even regulated by the PMPA, the lease relationship between the franchisor and its underlying lessor is not regulated by the PMPA. And, in fact, you get occasional commentary by the courts that say this act is in derogation of the rights of a franchisor. So let's be careful how aggressively we protect it or how aggressively we interpret it. And what we're doing here is we're undermining the rights of a franchisor to negotiate and to litigate with his own underlying lessor, who's not even a party. So we're just hamstringing. Counsel talked about the fact that we remained in possession. The operations went on. The reason we remained in possession is because the subtenant remained in possession. I wrote to Terfty's counsel. I said, what are you going to do with this property? We need to know. They said, we don't have to tell you because your subtenant is still in there. So by virtue of the preliminary injunction, which is now running three years, because the motions panel on this case let that the dissolution of the injunction continue. So even though the appellates have lost this case, they basically won. They've been in there for three years beyond the termination date under a set of franchise provisions that were given to them in 1997, should have rolled over in the year 2000, and are due to roll over again in the year 2005, a month from now. So they bootstrapped themselves into an ideal preferential franchise relationship in terms of rent provisions, which are frozen us vis-a-vis them, whereas our rent escalates vis-a-vis our landlord. They're locked into a rebate program or a fuel incentive allowance, which is a percentage of the volume of gasoline sold. They're locked into that that no other franchisee gets in our system and hasn't got for over three years. They're locked into that program, again, because of the preliminary injunction. And all we're trying to do is extricate ourselves or at least position ourselves vis-a-vis our landlord by saying, here, the property's emptied. We've certified the condition. We've replaced whatever needs to be replaced. We'll pull the tanks if you want. We'll leave them in place if you want. We're going to get our cleanup done as fast as we want, and we don't want someone running a service station increasing the risk, because that goes forward. That to me is the ironic thing about this case, is that you create an incentive and you create this loop around effect by allowing franchisees to stay in there. And you actually, frankly, give an incentive to the underlying landlord, who never identified any other tenant to go in there, to just kind of play along with this game by not making a fuss. Of course he's not going to object that our subtenant stays in there. In fact, we discontinued paying rent for five months, and he did nothing. So he had no other tenant. Sooner or later, we paid it. We made good on it. We've been paying it to date. But, and a thought that I wanted to mention is you said, well, they're operating now during the cleanup. Well, you know, there's another way to look at that, too. Under the underlying lease, if you're able to operate while the cleanup's going on, then there's no impairment of the use. I mean, the only tenant that wanted to go in there. The lease, the underlying lease continuation provision doesn't say you pay rent until your cleanup is done. It says you pay rent until you no longer interfere with me putting the next tenant in. Well, that next tenant always has been the franchisee. He just didn't, and he was willing to do that. We did everything we could to assign it to him, pursuant to the PNPA. And Thrifty, the underlying landlord, vetoed that and just said, well, we wanted to keep POSCO in there, which is a deep pocket for environmental risk. And separately, we, you know, the franchisee likes it because he's being subsidized, heavily subsidized. So that's the principal subjective law issue is this, do we have a technical right to grant possession that somehow should force us to continue the franchise? And I think you've got to go back to Hy-Fay. You've got to say, what's the base term? What's the reason for the extension? What's the motive of the franchisor? Is the franchisor trying to come back in the back door and open a company up or put another dealer in? Absolutely not. That contention was not made in this case, and it couldn't be made in this case. We wanted to exit once and for all. The two procedural questions, I don't know if you want argument on this. They've argued that the mere fact that we agreed to a continuation of the effective non-renewal date somehow made it all wrong. We had to go back to square one and give a new 90 days. I think that's elevating a preoccupation with procedure completely divorced from substance. I mean, the purpose of the notice is to give you plenty of time to make adjustments, to either stay there, move on, wind down your business. And in this case, the purpose was to – was for a long time for them to do a deal with Equilon, which is the Shell brand, which they accepted an offer on, and then separately get an assignment of the lease from Thrifty. And only Thrifty stood in the way of doing that, not us. The other thing is the disclosure of the underlying lease at the outside of the franchise. Again, the court, the district court found that was done. I mean, we laid it out. I don't think they ever read it. I think the record is very confusing as to whether they ever read the disclosure. There's all this argument about how it could have been confusing in the abstract. Well, I think that's just counsel's argument. He says, well, you know, if you really studied this, you might be confused. But there was no evidence of any confusion, any detrimental reliance. They're on inquiry notice if they want more information. And all we did was extend the term to give them an opportunity to stay in possession. Every single thing we did in terms of extensions that were faulted for were designed to advance the policy objectives of the 1994 amendments to the PMPA, which was in an underlying lease situation. That's maximize the chances that the franchisee gets to stay after the franchisor goes. The bond. The bond amount. Bond, yes. Let me just back up one step on it, Your Honor. This is a difficult case to understand unless you go back and you read the transcript from the preliminary injunction hearing in front of Judge Taylor. And I don't know if I have that. That's 46 through 90 of the appellate record. And what happened is we came in and we made the same arguments that I'm basically making to the Court right now. And Judge Taylor said, you know, I think there is this focus on procedure that I don't know if I agree or disagree with either side right now, but I've got this standard under HILO, which is a very liberal standard in terms of awarding preliminary injunctive relief. So I'm going to say there's a serious question. And then completely on his own, Judge Taylor went on to say, Counsel, why can't you just do it again? I mean, they're arguing, whether you agree with it or not, they're arguing that every time you give him a 30-day extension of the date he must exit, whether you said so or not, and we disclaimed in the document that we were doing this. But whether you said so or not, you were effectively renewing his franchise. So go back, do it again, disclose the underlying lease, do the 90-day notice instead of the 35 days, and then it's over. And he went to plaintiff's counsel, frankly said, why don't you start making plans, because in 90 days you're gone. Now, separately, we were worried about the fact we were losing money at this site. We were worried about a claim of holdover liability to Thrifty. We were worried about the chance of premises liability, environmental risk, anything else that a tenant involuntarily in possession might be concerned about. And so we asked for the bond, and Judge Taylor basically said, well, listen, I'm setting the bond on the expectation this is over within 90 days. So I'll set it at $25,000. And counsel for plaintiff at that time was arguing that, listen, all the damages you complain about, the fact that you lose money at this retail outlet, the fact that you pay more rent to Thrifty than you get from us is all your own doing. You dictate your own rent terms. And to an extent, he is right. But also under the PMPA, every time your three-year renewal period comes up, you can change the terms. Three or four cases out of this court have made it very clear that the courts are not going to do a lot of second-guessing on changing the rent terms. So what we did is we said, look, the judge said just do another 90-day notice, but he also happened to say that maybe there's an issue here as to this continuation because of the holdover for cleanup, and so maybe we come back 90 days from now and he holds us over again. All right? And then I'm asking for a bond again, and now we're stuck. And everyone said, well, you had your chance. So we went back and we used the rent formula, and counsel misstates the record when he says that everyone found those rent calculations wrong. He even admitted when asking for injunctive relief whether those numbers were okay to him, and he said, yes, except maybe a thousand bucks. And we gave we put in a ton of testimony as to how those rents are calculated in a situation where the service station is a losing proposition for us. All right. So then, based upon both the increase that would ordinarily come to pass, again, whether they accepted this new franchise or not that we offered because Judge Teller seemed to be indicating that was the way to go, whether we accepted that or not, or they accepted it as a formed contract, it still was a benchmark for what our losses were, what we would be ordinarily receiving in rent to offset our obligations to Thrifty and elsewhere. So as a measure of what the rent should be, and separately as an indication we put in evidence that we're losing money here, we pay high rents here. We put in evidence on that. We said this runs between eight and we're paying subsidies that we at our renewal period we would phase out. So all of these things add up to about $8,500 to $12,000 a month. And that's how I briefed it, all expecting, again, to be in front of Judge Teller. Then we have the reassignment. I don't know that Judge Walter was quite clear on the whole past history, but he certainly took time, and it's in the record, to pull back and say, all right, I see the potential gap here of about $8,500 a month. And I'm going to try to get you guys to trial in November. And so he calculated that. And, in fact, we came up to trial and there was a dispute over jury instructions not being tendered by plaintiff's counsel. And I had a motion to exclude evidence, so we moved it another two months. And I said, well, you know, every month I lose $10,000, in my view. That's what I'm going to claim someday. And he said, okay, we're going to move the trial to January. He increased it another $10,000. Now, there were other considerations besides potential rent shortfalls or overpaid subsidies or damages because we're an involuntary holdover tenant that were presented. And that was just the general sense of, hey, they could have a – someone could get killed on that property next week. Do you think they're going to sue the franchisee? No, they're suing us. That's a liability as – if the injunction is wrongful, we should have some remedy. All right, counsel. I think we understand. Okay. And I think – was there anything else? I think I covered pretty much. Okay. Thank you. Thank you very much. Just very briefly, Your Honor. You know, I know it's tough to be a multibillion-dollar oil company these days. But there's still a statutory purpose, franchise protection. There's still an explicit statutory scheme carefully crafted by Congress. And standing the test of time for about – for about 25 years. And counsel just doesn't want to talk about it. Counsel does not want to talk about the language of the statute. The court ought to apply the plain meaning of the statute and measure the plain meaning of the statute up against the conduct in this case. That's not hyper-technical formalism. That's not elevating anything over anything. That's just law. And that's applying a regulatory scheme enacted by Congress. In response to a comment that Mr. Earp said, told you a lot about what they want to do when they're trying to take things, that they can't do the tanks and can't do all this with the finery. None of that's in the record. All of that is outside the record. He just told you now. He's asking you to take his word for it. The court ought to make its determinations based on what's in the record. The court ought to apply the burden of proof that lay on his shoulders at trial under Section 2805C of the statute and look for that proof in the record. When you look for that proof in the record, it just isn't there. All of the cases regarding underlying leases that they rely on concern a voluntary expiration of the lease, a failure to accept an option. The lease comes to a natural term and the franchise versus to natural and the franchise versus I'm not going to extend it. And the courts repeatedly say, okay, that's within your right. The underlying term has expired. This is a case where the lease by its terms remains in effect. That's what the lease says on its face. Counsel says, well, there's – again, so I wrote to Thrifty's counsel and they didn't say that also was outside the record. His evidence that there was no impairment of Thrifty's – his claim that there was no impairment of Thrifty's intended use for the station. No evidence of that in the trial record. All of this is facts that he wants to come up with now to justify a decision in retrospect that can't be justified on the record in this case, which is why reversal ought to be – reversal ought to be in order here, Your Honor. Again, we're not trying to seek any preferential provision. We're trying to seek the remedy that Congress want us to have, which is a continuation of the franchise relationship unless and until it is brought to a close under the provisions of the Petroleum Marketing Practices Act. That hasn't happened here. Thank you, Your Honor. All right. Thank you, counsel. Doss v. Tosco is submitted, and we'll take up Camel v. Equilon Enterprises. Thank you.
judges: Tashima, Wardlaw, Collins